**REMAND** the case for further proceedings consistent with this opinion.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0020P (6th Cir.)
File Name: 03a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

ERIC SCOTT PATTERSON,
     *Petitioner-Appellant,*

     *v.*

THOMAS HASKINS,
     *Respondent-Appellee.*

No. 00-4373

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 99-00527—Edmund A. Sargus, Jr., District Judge.

Argued: August 7, 2002

Decided and Filed: January 15, 2003

Before: MOORE and GILMAN, Circuit Judges; ROSEN,
District Judge.[*]

————————————

**COUNSEL**

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. Bruce D. Horrigan, CORRECTIONS LITIGATION SECTION, Cleveland, Ohio, for Appellee. **ON BRIEF:**

---

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Dennis C. Belli, Columbus, Ohio, for Appellant.  Bruce D. Horrigan, CORRECTIONS LITIGATION SECTION, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

RONALD LEE GILMAN, Circuit Judge.  On the afternoon of December 17, 1994, Eric Scott Patterson was home with his three-year-old daughter, Lacey, who was not feeling well. At 4:00 p.m., Patterson called a neighbor, Curtis Jack Taylor, to ask if he would bring some Children's Tylenol to Patterson's house for Lacey.  Taylor brought over the medicine at 4:45 p.m., and he remained there until 9:30 p.m. Patterson's wife, Lisa, returned home at approximately 11:00 p.m.  About an hour later, Patterson gave Lacey some Pedialyte to settle her stomach.  Shortly after 3:30 a.m. the following morning, the Pattersons heard Lacey moaning and breathing heavily.  They called for emergency assistance at 4:11 a.m.  An emergency medical technician (EMT) arrived promptly, but by then Lacey was not breathing.  After being rushed to the hospital, Lacey was pronounced dead at 5:01 a.m.  A subsequent autopsy determined that she died of peritonitis caused by the rupturing of her small bowel. Hospital personnel noticed multiple contusions on Lacey's body and that her stomach was distended, puffy, and hard to the touch.

The state of Ohio, proceeding on the theory that Lacey had been beaten and abused by her father, indicted Patterson for murder.  The jury found him guilty of the lesser included offense of involuntary manslaughter based on child endangering.  He was subsequently sentenced to between 10 and 25 years in jail.  After unsuccessfully appealing his conviction and sentence in the Ohio court system, Patterson filed a petition for a writ of habeas corpus in which he claimed that (1) a defective jury instruction violated his due process rights, and (2) his conviction was not supported by sufficient evidence of guilt.  The district court dismissed

*Neder v. United States*, 527 U.S. 1, 17 (1999).  Such, however, is not the case here.  Patterson disputed the cause of Lacey's injuries, and the proof that he caused them was not "overwhelming."  For these reasons, we have "grave doubt" that the trial court's omission of the element of proximate result from the crime of conviction was harmless error. *O'Neal*, 513 U.S. at 436.  Because we conclude that the trial court's omission was not a harmless error, we reverse the judgment of the district court.

## C.  Sufficiency of the evidence

Our conclusion on the jury-instruction issue makes it unnecessary for us to decide whether there was sufficient evidence to support Patterson's conviction.  Indeed, it would be imprudent to address the question in light of the erroneous instruction.  When the jury decided (according to faulty instructions) that Patterson was guilty of involuntary manslaughter based on child endangering, it ceased deliberating and therefore did not reach a decision on whether Patterson was guilty of the lesser included offense of involuntary manslaughter based on simple assault.  A reasonable, properly instructed jury might have concluded that the evidence was insufficient to establish the causation element of involuntary manslaughter based on child endangering, yet then have convicted on the lesser included offense of involuntary manslaughter based on simple assault. For this reason, we will refrain from commenting on whether sufficient evidence was presented for the jury to have found guilt beyond a reasonable doubt based on the essential elements of a crime for which the jury was never completely charged.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court, **GRANT** Patterson a conditional writ of habeas corpus that will result in his release from prison unless the state of Ohio commences a new trial against him within 180 days from the date of this opinion, and

explain that "proximate result" is an element of involuntary manslaughter based on child endangering.

Furthermore, direct evidence in the record indicates that the jury was in fact confused as to the elements of involuntary manslaughter. The jury, during its deliberations, asked the trial court to clarify "[t]he definition of involuntary manslaughter." Instead of taking this opportunity to resolve the jury's confusion, the judge simply replied that the jury should "refer to pages 14 through 30 of the instructions." This means that the trial court essentially referred the jurors back to the source of their confusion.

Finally, although the state claims that the inclusion of the element of proximate result in the jury instructions that were read just before and just after the jury instructions for involuntary manslaughter based upon child endangering were legally sufficient, it is likely that those instructions also contributed to the jury's confusion. If proximate result had been included only in the jury instruction for involuntary manslaughter based on aggravated assault, the argument that the element was implied in the rest of the involuntary manslaughter charges would be substantially stronger. As it happens, however, proximate result was omitted only from the elements for the charge of involuntary manslaughter based on child endangering. The jury was therefore likely to consider the absence of the element as being a meaningful distinction between involuntary manslaughter based on child endangering, on the one hand, and involuntary manslaughter based on aggravated assault or simple assault on the other.

After viewing the omission of the proximate-result element "in the context of the overall charge," we are not convinced that the other jury instructions minimized the trial court's error or the potential for juror confusion. We are also particularly troubled by the fact that the jury was actually confused about the definition of involuntary manslaughter. Nevertheless, we would still find the erroneous instruction harmless were we to "conclude[] that the omitted element was uncontested and supported by overwhelming evidence."

Patterson's petition after concluding that his claims were without merit. For the reasons set forth below, we **REVERSE** the judgment of the district court, **GRANT** Patterson a conditional writ of habeas corpus that will result in his release from prison unless the state of Ohio commences a new trial against him within 180 days from the date of this opinion, and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual background

At approximately 2:50 p.m. on the afternoon of Saturday, December 17, 1994, Patterson's wife, Lisa, left home to go to work. Patterson remained at the residence with his three-year-old daughter, Lacey.

Taylor, a family friend who was a former emergency medical technician, telephoned Patterson at 3:30 p.m. because the two men had plans to go shopping together. Patterson told Taylor that Lacey was sick and that she had been vomiting. During a subsequent telephone conversation a half-hour later, Patterson asked Taylor if he would bring him some Children's Tylenol for Lacey. Taylor arrived at Patterson's home at approximately 4:45 p.m. with the Children's Tylenol that Patterson had requested. Patterson took the medicine and brought it upstairs. He soon returned downstairs, carrying Lacey in his arms. Lacey told Taylor, "I don't feel so good." After Lacey indicated that she wanted to go back to bed, Patterson returned her to an upstairs bedroom.

When Lacey began throwing up again, Patterson decided to buy her some Sprite to settle her stomach. He briefly left the house, leaving Lacey alone with Taylor for approximately 10 minutes. After Patterson returned, Lacey drank some of the Sprite, and she apparently began to feel somewhat better. Patterson and Taylor then watched television and talked while Lacey rested upstairs for the next several hours. During this time, Patterson kept going upstairs to check on Lacey's condition. Taylor left the house at 9:30 p.m. and returned

home. At some time between 10:15 and 10:30 p.m., Taylor telephoned Patterson to check on Lacey's well-being. Patterson told Taylor that Lacey had vomited again and that he was cleaning her up.

When Lisa Patterson returned from work at approximately 11:00 p.m., she went upstairs to check on Lacey's condition. Lacey, who had been sleeping, told Lisa that her stomach hurt and asked for some 7-Up or Sprite. At approximately 11:45 p.m., Patterson telephoned Taylor, who was then at work at a convenience store. Patterson asked Taylor if the store he worked at carried Pedialyte, an over-the-counter treatment for dehydration. Taylor told Patterson that his store did not stock Pedialyte, but he volunteered to call other area stores to find out who carried the product. After Taylor located a store that had Pedialyte, he telephoned Patterson and told him that the store with the product was closing in approximately ten minutes. Lisa then went to the store and purchased a bottle of Pedialyte. When she returned home, Lacey drank approximately half of the contents of the bottle.

Taylor telephoned the Pattersons at approximately 1:00 a.m. (on Sunday, December 18, 1994) to check on Lacey's status. Lisa told him that Lacey had drunk the Pedialyte and fallen asleep. Although Lisa expressed concern about Lacey's condition, she told Taylor that she believed that Lacey would be alright. Taylor shared Lisa's concern, but, at that point, he agreed that Lacey's malady could still be treated with over-the-counter medicine.

The Pattersons stayed up with Lacey until 3:30 a.m. At that time, they placed the child on a couch and went to their bedroom. A short time later, however, Lisa heard Lacey moaning and breathing heavily. When the Pattersons checked on Lacey, she told them that her stomach hurt. Patterson checked her stomach and found that it was unusually hard.

At approximately 3:50 a.m., the Pattersons telephoned Taylor and told him that Lacey's condition had deteriorated markedly and that her eyes were rolling back. The Pattersons told Taylor that they were going to take Lacey to the hospital,

(holding that a state trial court's failure to instruct the jury as to an element of the crime of conviction, which was before the Supreme Court on a petition for federal habeas corpus, was subject to harmless-error review). In the context of federal habeas corpus review, the omission of an element is not a harmless error if there is "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 627 (1993)).

The state contends that the omission of the element of proximate cause was harmless because the trial court had (1) earlier instructed the jury that "[t]he offense of murder is distinguished from involuntary manslaughter by the absence or failure to prove the purpose to cause death," and (2) included the element of proximate cause in its instructions on the elements of the offenses of involuntary manslaughter based on aggravated assault and involuntary manslaughter based on simple assault. As the state has pointed out, "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). We have concluded, however, that the other instructions upon which the state relies to clarify the elements of the crime of involuntary manslaughter based on child endangering were not sufficient. In fact, these instructions might have actually contributed to the jury's confusion.

First, the general instruction on the difference between murder and involuntary manslaughter does not state that "the absence or failure to prove the purpose to cause death" is the *only* distinction between the offense of murder and the offense of involuntary manslaughter. It simply states that "[t]he offense of murder is distinguished from involuntary manslaughter by the absence or failure to prove the purpose to cause death." That statement leaves open the possibility that the offenses might be "distinguished" in other ways. As a result, this general instruction on the difference between murder and involuntary manslaughter was insufficient to

jury to determine whether the government had proved an element of the crime of conviction violated the defendant's constitutional rights, *id.* at 522-23.

Instead of examining whether the trial court's instructions complied with the constitutional mandate that gives a criminal defendant "the right to have a jury determine, beyond a reasonable doubt, his guilt *of every element* of the crime with which he is charged," the Ohio Court of Appeals concluded that the jury instruction was "sufficiently detailed," because the trial court had correctly instructed the jury as to all of the elements of two other crimes with which Patterson was charged. By applying a standard that requires the jury instructions only to be "sufficiently detailed," the Ohio Court of Appeals applied a rule that contradicted the governing law as set forth by the Supreme Court in *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995). We therefore turn to the question of whether the constitutional error at trial was harmless.

### d.    Harmless-error review

During oral argument before us on appeal, the state conceded that the trial court erred in setting forth the instructions for involuntary manslaughter based on child endangering, but contended that the error was harmless. Under the Due Process Clause of the Fourteenth Amendment, a defendant in a criminal case is protected against conviction except upon proof beyond a reasonable doubt of every element necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 364 (1970); *Davis v. United States*, 160 U.S. 469, 487-88 (1895). But the Supreme Court has held that "an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. United States*, 527 U.S. 1, 9 (1999) (emphasis in original).

Instead, a defendant's due process rights are implicated only if the omission of an element is not a harmless error. *Id.* at 9-10; *California v. Roy*, 519 U.S. 2, 4 (1996) (per curiam)

but Taylor advised them to telephone for emergency assistance immediately. After he hung up the telephone, Taylor rushed to Patterson's home.

Lisa telephoned for emergency assistance at 4:11 a.m., reporting that Lacey was unconscious and in need of medical attention. She later made a second telephone call for emergency assistance because the medical squad was having difficulty finding Patterson's address. EMT Brenda Fay Forker arrived at Patterson's home at 4:21 a.m. Because she was unable to detect Lacey's pulse, she began to administer CPR. Forker was unable, however, to resuscitate the child. A second emergency squad, the Community Ambulance Squad (CAS), arrived while Forker was administering CPR. The CAS attempted to establish an airway by intubating Lacey, but they were unable to introduce the tube into her lungs. The EMTs then brought Lacey out to their emergency vehicle in order to take her to Good Samaritan Hospital. At this point, Forker intubated Lacey and gave her drugs to try to stimulate her heart. These attempts to resuscitate Lacey were also unsuccessful. In route to the hospital, the EMTs continued administering CPR.

An emergency room nurse, Mary Katherine McGuire, met the incoming emergency squad at the entrance to the hospital. McGuire noted that Lacey was "lifeless" and "blue" upon arrival at the hospital. At this point, the hospital's respiratory therapist took over the attempt to resuscitate the child. When McGuire removed Lacey's nightgown, she observed multiple contusions (bruises) on Lacey's body. McGuire testified that some of the bruises were brown or light brown, while others were purple. This indicated to McGuire that the bruises were "in various stages" of healing. She noted that none of the bruises, however, were new.

While attempts were being made to try to resuscitate Lacey, McGuire went out to the waiting room to develop a case history. She asked Patterson if he could "please tell me has anything happened to Lacey in the last few days, few hours, anything." McGuire testified that Patterson told her that, "as

far as trauma" goes, Lacey "fell down the stairs two weeks ago." She also testified that Patterson reported that Lacey had vomited a little on Saturday night, and that he had given her some Tylenol and put her to bed. According to McGuire, "[n]othing else unusual was noted about Lacey."

After various other attempts to resuscitate Lacey failed, she was pronounced dead at 5:01 a.m. Approximately two-and-a-half to three hours later, Captain Larry Sims of the Muskingum County Sheriff's Department questioned Patterson about his daughter's death. Patterson told Sims that, given how soon it was after her death, he did not think it was an appropriate time to talk. After his initial hesitation, however, Patterson agreed to talk to the investigator. Sims proceeded to ask Patterson about the bruises on Lacey's body. According to Sims, Patterson denied that she had any bruises. But when Sims showed Patterson some photographs of his dead daughter, Patterson "put his head down, appeared to be, you know, emotional, possibly crying. Then he just got up, [and] said he wanted to leave." Patterson did, however, say that he would be willing to speak to Sims later. The Pattersons also allowed investigators to search their house.

The Muskingum County sheriff, Bob Stephenson, spoke with Lisa Patterson shortly after Lacey's death, while she was still in the waiting room of the hospital. Stephenson asked her about the bruises on Lacey's body. According to Stephenson, Lisa speculated that the bruises must have been caused by the CPR. Lisa also said that she had not seen bruises on Lacey's chest area and abdomen two days earlier, when she had last seen that part of Lacey's body. In response to Stephenson's attempts to ascertain the source of Lacey's injuries, Lisa mentioned that her daughter fell down a staircase approximately one week before her death and that she also recently hurt her eye while she was "flinging around" a Barbie doll. Stephenson also testified that Lisa told him that "the last time . . . she had seen Lacey prior to the 18th would have been the 16th on Friday."

on this legal issue rather than a factual determination, the "unreasonable application" prong of § 2254(d)(1) does not govern our analysis. *See Doan v. Brigano*, 237 F.3d 722, 730 (6th Cir. 2001) (holding that the "unreasonable application" prong did not apply in a case where the state court of appeals failed to correctly identify the governing legal principle).

Our analysis is instead governed by the question of whether the state appellate court's adjudication of the claim "resulted in a decision that was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1). A state appellate court's decision is "contrary to" clearly established Supreme Court precedent only if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or if it "confronts a set of facts that are materially indistinguishable from a [Supreme Court decision] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

In *Gaudin*, the defendant was charged with making false statements on Department of Housing and Urban Development (HUD) loan documents, in violation of 18 U.S.C. § 1001. The trial court instructed the jury that "the Government was required to prove, *inter alia*, that the alleged false statements were material to the activities and decisions of HUD," but that "[t]he issue of materiality . . . is not submitted to you for your decision but rather is a matter for the decision of the court." *Gaudin*, 515 U.S. at 508 (alteration in original and internal quotation marks omitted). As in the present case, the parties agreed that the omitted instruction ("materiality" in *Gaudin*, "proximate result" here) was a necessary element of the crime of conviction. *Id*. at 509. The parties in *Gaudin*, like those in the case before us, also agreed on the definition of the element in question. *Id*. After noting that the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt," *id*. at 510, the Supreme Court held that the trial court's refusal to allow the

the natural and foreseeable consequences that follow, in the ordinary course of events, from the act or failure to act.

Physical harm to persons means any injury, illness, or other physiological impairment, regardless of its gravity or duration.

If you find beyond a reasonable doubt that the Defendant committed the offense of assault – assault and that the death of Lacey Patterson was proximately caused by such unlawful act, then you will find the defendant guilty of involuntary manslaughter even though the Defendant had no purpose or intention of causing the death of Lacey Patterson.

### c.    *The state appellate court decision*

The Ohio Court of Appeals was the only state court to address the merits of Patterson's appeal of the jury-instruction issue. Its analysis was limited, however, to the two-paragraph explanation quoted in Part II.B.1. above. Basically, the court determined that the instructions for the offense of which Patterson was convicted were "sufficiently detailed" to sustain his conviction because the instructions for that offense were "bookended" by instructions that included causation as an element of involuntary manslaughter based on other predicate acts. At no point in its brief discussion, however, did the Ohio Court of Appeals acknowledge that the United States Supreme Court has clearly held that "[t]he Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt *of every element of the crime with which he is charged*." *United States v. Gaudin*, 515 U.S. 506, 522-23 (1995) (emphasis added).

Instead, the Ohio Court of Appeals concluded that the jury instruction was "sufficiently detailed" because the trial court had correctly instructed the jury as to all of the elements of two other crimes with which Patterson was charged but not convicted—involuntary manslaughter based upon aggravated assault and involuntary manslaughter based upon simple assault. Because the Ohio Court of Appeals based its decision

Patrick M. Fardal, M.D., a forensic pathologist for the Franklin County Coroner's Office, performed an autopsy on Lacey on Monday, December 19, 1994. Dr. Fardal testified that Lacey had the following injuries on the outside of her body: (1) bruises on her face, head, trunk, and extremities, (2) some scratches, and (3) superficial loss of skin on her trunk. In particular, Dr. Fardal testified that Lacey had a series of bruises on her abdomen. According to Dr. Fardal, some of these bruises were "recent" and some were "one to two days old." He acknowledged, however, that it is not possible to determine the exact age of a bruise.

An internal examination revealed that Lacey "had an injury to his [sic] jejunum, which is a portion of the small bowel, and the mesentery that supplies it." Dr. Fardal testified that "this injury was caused by a blunt force trauma to his [sic] abdomen – her abdomen, excuse me. Blunt force trauma to the abdomen and basically compressing the bowel against the backbone in most cases." He testified that the original insult "could have by itself" started the peritonitis that led to Lacey's death. On direct examination, Dr. Fardal estimated that "the original insult would have occurred probably about a day before the child's death." During recross-examination, however, he said that the initial trauma occurred between 24 to 36 hours before Lacey's death.

Dr. Fardal testified that the "blunt force trauma" that he thought caused Lacey's initial injury "would have to be at least moderate to severe amount of force, and the force would have to be exerted on the abdomen . . . ." He noted that "bowel injuries are not associated with, normally, with falls down steps." But Dr. Fardal did acknowledge that the trauma to the inside of her bowel might have been caused by a variety of other possible sources. He specifically testified that "anything that can cause blunt force injury could be responsible, so there's lots of things that cause blunt force injury," and that, as a result, the initial injury Lacey suffered was not necessarily caused by another human being.

Dr. Fardal also noted that, in addition to the initial blunt force trauma, "there was a subsequent bursting of the bowel where the fluid leaked out which caused an additional problem" for Lacey. According to Dr. Fardal, once Lacey's bowel was perforated, "the child could have survived a matter of hours." In response to a question on direct examination, he stated that six to eight hours was a "reasonable" estimate. Dr. Fardal testified that the perforation of the bowel was not necessarily caused by an additional trauma. More specifically, he said that although the perforation could have resulted from a second trauma, perhaps even a minor one, the bowel could also have perforated solely because it was weakened by the trauma that occurred at least one day before Lacey's death.

## B.  Procedural background

In August of 1995, Patterson was indicted for murder, in violation of Ohio Revised Code § 2903.02. Patterson's wife, Lisa, was indicted only for felony child endangerment, in violation of Ohio Revised Code § 2919.22(A). After a joint trial, the jury found Patterson guilty of the lesser included offense of involuntary manslaughter based on child endangering, in violation of Ohio Revised Code § 2903.04(A). Patterson was subsequently sentenced to a term of imprisonment of between 10 and 25 years. Lisa was found guilty of misdemeanor child endangering and sentenced to six months in prison.

In August of 1997, Patterson filed a notice of appeal, claiming that (1) the trial court violated his due process rights by excluding the testimony of an expert witness, and (2) there was insufficient evidence to sustain his conviction. The Ohio Court of Appeals overruled these two assignments of error and affirmed the trial court's judgment.

Patterson then filed a notice of appeal to the Ohio Supreme Court, challenging the sufficiency of the evidence. While his notice of appeal was pending before the Ohio Supreme Court, Patterson, who was now being represented by new counsel, filed an application to reopen his appeal in the Ohio Court of

involuntary manslaughter based on child endangering, your verdict must be guilty of involuntary manslaughter.

This instruction differs from the preceding one on involuntary manslaughter based on aggravated assault not only because the substantive elements of the predicate offense are different, but because it omits the requirement that Patterson "*caused* the death of Lacey Patterson as a *proximate result* of committing or attempting to commit the [predicate act]." (Emphasis added.) Looking solely at the instructions for the offense of conviction, the jury was therefore free to convict Patterson on this charge without finding that the "reckless abuse" was the proximate cause of Lacey's death.

The trial court then proceeded to explain that, if the jury's verdict was "not guilty of involuntary manslaughter based on child endangering," or if the jurors were "unable to agree on a verdict of either guilty or not guilty of involuntary manslaughter based on child endangering," they were to continue their deliberations "to decide whether the State proved beyond a reasonable doubt all the essential elements of the lesser included offense of involuntary manslaughter based on assault."

At this point, the trial court stated that, "[b]efore you can find the Defendant guilty of assault, you must find beyond a reasonable doubt that on or about the 18th day of December, 1994, and in Muskingum County, Ohio, the Defendant, Eric Scott Patterson, knowingly caused or attempted to cause physical harm to Lacey Patterson." After the trial court defined the term "knowingly," it stated:

The State charges that the act or failure to act of the Defendant caused death. Cause is an essential element of this offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death without which it would not have occurred.
The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for

A death is the result of an act or failure to act when it is produced directly by the act or failure to act in a natural and continuous sequence and which would not have occurred without the act or failure to act. [Proximate] [r]esult occurs when the death is naturally and foreseeably caused by the act or failure to act.

The trial court then explained that, if the jury's verdict was "not guilty of involuntary manslaughter based on aggravated assault," or if the jurors were "unable to agree on a verdict of either guilty or not guilty of involuntary manslaughter based on aggravated assault," they were to continue their deliberations "to decide whether the State proved beyond a reasonable doubt all the essential elements of the lesser included offense of involuntary manslaughter based on child endangering." At this point, the trial court stated:

Before you can find the Defendant, Eric Scott Patterson, guilty of endangering children, you must find beyond a reasonable doubt that on or about the 18th day of December, 1994, and in Muskingum County, Ohio, the Defendant, Eric Scott Patterson, recklessly abused Lacey Patterson.
Abuse means any act which causes physical or mental injury that harms or threatens to harm the child's health or welfare.
A person acts recklessly when, with heedless indifference to the consequences, [he] perversely disregards a known risk that his conduct is likely to cause a certain result. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
Substantial risk means a strong possibility, as contrasted with a remote or even a significant possibility, that a certain result may occur or that a certain circumstance may exist.
If you find that the State proved beyond a reasonable doubt all the essential elements of the offense of

Appeals. Patterson specifically claimed that his previous attorney's failure to raise four additional assignments of error on direct appeal constituted the ineffective assistance of counsel. Of these four assignments of error, the only assignment relevant to the proceedings currently before us is Patterson's claim that the trial court "failed to instruct the jury that, before it could find him guilty of involuntary manslaughter based on child endangering, the prosecution must prove beyond a reasonable doubt a causal connection between the death of the child victim and the commission of the underlying offense of child endangering." The Ohio Court of Appeals denied Patterson's application for reopening his appeal in November of 1998.

In the meantime, the Ohio Supreme Court had denied Patterson's leave to appeal. After the Ohio Court of Appeals rejected his application for reopening his appeal, Patterson again sought review by the Ohio Supreme Court. The Ohio Supreme Court dismissed this second appeal in March of 1999.

Patterson proceeded to file a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio in June of 1999. In his petition for habeas corpus, Patterson raised six grounds for relief. The district court denied Patterson's petition in September of 2000 without holding an evidentiary hearing.

After Patterson filed a timely notice of appeal, the district court granted a certificate of appealability as to the following issue: "Was petitioner denied due process when the trial jury was given an instruction on the lesser-included offense of involuntary manslaughter based on child endangerment which did not include the element of proximate cause?" Our court later certified the following additional issue for appeal: "Did the prosecution fail to produce sufficient evidence on each element of the crime of conviction sufficient to meet due process requirements of the Fifth and Fourteenth Amendments?"

## II.   ANALYSIS

### A.   Standard of review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies to Patterson's case because he filed his habeas corpus petition pursuant to 28 U.S.C. § 2254 after the Act's effective date. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). A federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In the case before us, all of Patterson's claims are governed by § 2254(d)(1).

A federal court may grant a writ of habeas corpus under § 2254(d)(1)'s "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Section 2254(d)(1)'s "unreasonable application" clause provides two additional bases for habeas relief. *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir. 2001), *cert. denied*, 122 S. Ct. 1448 (2002). The first avenue of relief occurs if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts . . . ." *Williams*, 529 U.S. at 413. Second, relief is available under this provision if the state court decision "either unreasonably extends or unreasonably refuses to extend a legal principle

After instructing the jury on the charged offense of murder, the trial court explained that, "[i]f all of you are unable to agree on a verdict of either guilty or not guilty of murder," or "if you find that the State failed to prove beyond a reasonable doubt all the essential elements of murder, . . . you will continue your deliberation to decide whether the State has proved beyond a reasonable doubt all the essential elements of the lesser included offense of involuntary manslaughter based on aggravated assault." The trial court then told the jury that "[t]he offense of murder is distinguished from involuntary manslaughter by the absence or failure to prove the purpose to cause death."

At this point, the trial court proceeded to set forth the elements of the offense of involuntary manslaughter based on aggravated assault:

Before you can find the Defendant, Eric Scott Patterson, guilty of involuntary manslaughter based on aggravated assault, you must find beyond a reasonable doubt that the Defendant, on or about the 18th day of December, 1994, and in Muskingum County, Ohio, caused the death of Lacey Patterson as a proximate result of committing or attempting to commit the offense of aggravated assault.

After stating and defining the elements of the predicate felony of aggravated assault, the trial court explained the meaning of the terms "cause" and "proximate result":

The State charges that the act or failure to act of the Defendant caused death. Cause is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the death without which it would not have occurred.

The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act or failure to act. The Defendant is also responsible for the natural and foreseeable consequences that follow, in the ordinary course of events, from the act or failure to act.

unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." Ohio Rev. Code § 2903.04(A). The "proximate result" requirement has been described as follows:

> The term "proximate result" was used by the General Assembly to refine and limit the verb "cause." Thus, it is conceivable that defendant's conduct may have caused [an individual's] death in the sense that he set in motion events which culminated in her death, which therefore would not have occurred in the absence of that conduct, but, nevertheless, that the death was not the proximate result of his conduct if it were not the natural, logical, and foreseeable result of his conduct. Under the statute, defendant cannot be held responsible for consequences no reasonable person could expect to follow from his conduct; he will be held responsible for consequences which are direct, normal, and reasonably inevitable—as opposed to extraordinary or surprising—when viewed in the light of ordinary experience. In this sense, then, "proximate result" bears a resemblance to the concept of "proximate cause" in that defendant will be held responsible for those foreseeable consequences which are known to be, or should be known to be, within the scope of the risk created by his conduct. Here, that means that death reasonably could be anticipated by an ordinarily prudent person as likely to result under these or similar circumstances.

*State v. Losey*, 491 N.E. 2d 379, 382 (Ohio Ct. App. 1985) (citations omitted). As this quote makes clear, proximate causation is an essential element of the offense of involuntary manslaughter pursuant to Ohio Revised Code § 2903.04(A).

### b.   The jury instructions given by the trial court

The written instructions that were given to the jury are not part of the state or district court record in this case. We will therefore base our analysis on the transcript of the oral instructions that were given to the jury.

from Supreme Court precedent to a new context." *Campbell*, 260 F.3d at 539.

The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411.

### B.   Jury instruction

Patterson claims that his due process rights were violated when the state trial court omitted the necessary element of proximate cause from its jury instructions on the crime of involuntary manslaughter based on the predicate felony offense of child endangering. Because Patterson was ultimately convicted of committing this offense, he claims that the state court's error violated his Fourteenth Amendment due process rights. In response, the state contends that this claim has been procedurally defaulted and that it is also without merit. We will first address the question of whether Patterson's claim has been procedurally defaulted.

### 1.   *Procedural default*

A federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the [state] court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). The adequate-and-independent-state-ground doctrine has been applied in refusing to address the merits of a federal claim because of violations of state procedural rules, such as the failure to make a timely objection at trial. *Id*. at 261. An adequate and

independent finding of procedural default will preclude habeas corpus relief, unless the petitioner can show cause for the default and actual prejudice as a result of the alleged violation of federal law, or establish that the failure to consider the federal claim will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

In determining whether a procedural default has occurred and, if so, what effect the default will have on federal review of a state conviction, the district court must consider whether (1) a state procedural rule exists that applies to the petitioner's claim, (2) the petitioner failed to comply with the rule, (3) the state court actually applied the state rule in rejecting the petitioner's claim, and (4) the state procedural rule is an adequate and independent ground upon which the state can rely to deny relief. *Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998). The rule precluding federal habeas corpus review of claims rejected by the state courts on state procedural grounds applies only in cases where the state rule relied upon by the state courts involves a "firmly established and regularly followed state practice." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). Furthermore, a procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case "clearly and expressly states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (citation and internal quotation marks omitted).

In this case, Patterson's trial attorney did not object to the jury instructions, and neither of the two assignments of error that he raised on direct appeal pertained to the jury instructions. After retaining new counsel, however, Patterson raised this issue in his application to reopen the appeal that he filed with the Ohio Court of Appeals. Patterson specifically claimed that the trial court "failed to instruct the jury that, before it could find him guilty of involuntary manslaughter based on child endangering, the prosecution must prove beyond a reasonable doubt a causal connection between the

death of the child victim and the commission of the underlying offense of child endangering."

In addressing this additional assignment of error, the Ohio Court of Appeals stated:

> We have reviewed the jury instructions given at trial, and we find the trial court defined causation and foreseeability thoroughly in the instruction on the offense of involuntary manslaughter based upon aggravated assault, given just prior to the instruction of child endangering, as well as in the instruction on the lesser included offense of manslaughter based upon simple assault, given after the instruction on involuntary manslaughter based upon the underlying offense of child endangering.
>
> We find that the trial court's instructions to the jury were sufficiently detailed and a correct statement of Ohio law. We conclude that the court did not commit error, plain or otherwise in giving of the jury instructions.

The Ohio Court of Appeals, in denying Patterson's application to reopen his appeal, did not "clearly and expressly state[] that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (citation and internal quotation marks omitted). Instead, when the Ohio Court of Appeals concluded that "the court did not commit error, plain *or otherwise* in giving of the jury instructions," it indicated that the decision rested on an evaluation of the merits of his claim. (Emphasis added.) Furthermore, the Ohio Court of Appeals made no mention of Patterson's failure to object to the jury instructions during trial. We therefore conclude that Patterson is not procedurally barred from pursuing this claim. *Id*. The merits of the claim will now be addressed.

### 2.  Merits

#### a.  Definition of involuntary manslaughter in Ohio

The Ohio Revised Code defines "involuntary manslaughter" as "caus[ing] the death of another or the